**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| JOSHUA HUGHES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:18-cv-01235 |
| v. | ) | |
| | ) | |
| NATIONWIDE BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Pending before the Court is Plaintiff Joshua Hughes's Motion to Amend/Correct his Complaint. (Mot. to Amend, ECF No. 45; Compl., ECF No. 1.) Because the Court concludes that a significant portion of the amendments in the Proposed Amended Complaint ("PAC"), ECF No. 45-1, are futile, the Motion to Amend is denied.

## I.     BACKGROUND

### A.  Subject-Matter Jurisdiction Defects

The Court initially notes that both the Complaint and the PAC contain a jurisdictional defect that must be addressed. The Complaint asserts subject-matter jurisdiction on the basis of diversity jurisdiction under 18 U.S.C. § 1332(a) and (d). (Compl. ¶¶ 16–17.) With respect to diversity of citizenship jurisdiction under § 1332(a), the Complaint alleges that Plaintiff is a resident of Pennsylvania and that Defendant is a corporation with a principle place of business in Ohio, and the amount in controversy exceeds $75,000. (*Id.*) "Plaintiff's references to the individuals as 'residents' rather than 'citizens' are 'jurisdictionally inadequate.' Mere residency is insufficient for purposes of diversity of citizenship." *Coulter v. Tatananni*, No. 17-629, 2017

1

U.S. Dist. LEXIS 102900, at *6 (W.D. Pa. June 30, 2017) (quoting *McNair v. Synapse Group, Inc.*, 672 F.3d 213, 219 n.4 (3d Cir. 2012)). "The burden of establishing federal jurisdiction rests with the party asserting its existence." *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015). Although this defect escaped the Court's attention until now, it still must be addressed, as it goes to this Court's jurisdiction to hear this case. Without establishing Plaintiff's citizenship, Plaintiff fails to establish diversity jurisdiction under § 1332(a).

With respect to CAFA jurisdiction under § 1332(d), Plaintiff merely alleges that "at least one class member is a citizen of a different state than Defendant." (Compl. ¶ 17) But, there are no allegations of the citizenship of any class member, including Plaintiff.[1] *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016). In *Carter*, the Second Circuit questioned whether a complaint established CAFA jurisdiction where it pled that all parties except one were citizens of New York, and that one party "is a citizen of a different state." *Id.* The Second Circuit found this allegation "entirely conclusory" and left it to the district court to determine whether there was diversity of citizenship. *Id.* Because the Complaint fails to establish the citizenship of any purported class member or even Plaintiff himself, it fails to establish subject-matter jurisdiction under § 1332(d).

The PAC, interestingly, does not plead § 1332(d) diversity jurisdiction, but its repeated failure to plead Plaintiff's citizenship creates the same jurisdictional defect with respect to § 1332(a). (ECF No. 45-1 ¶ 24.) This alone requires the Court to deny the Motion to Amend on

---

[1] Although it has yet to be addressed by our Court of Appeals, all but one of the circuits to have addressed the issue have held that the domicile-residency difference matters in the CAFA context as well. *See Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 397–98 (6th Cir. 2016) (Kethledge, J., dissenting) (collecting cases); *Nichols v. Chesapeake Operating, LLC*, 718 F. App'x 736, 741 (10th Cir. 2018) (joining the majority of circuits). *But see Ellis v. Montgomery Cty.*, 267 F. Supp. 3d 510, 518 (E.D. Pa. 2017) (predicting the Third Circuit would not join the majority).

the basis that the PAC fails to invoke this Court's subject-matter jurisdiction and, because the operative Complaint is also deficient, dismiss this case without prejudice. Because this defect is likely curable, the Court will continue to analyze Defendant's arguments related to the futility of the proposed amended claims, to determine whether Plaintiff will be granted leave to amend his Complaint, albeit with a second proposed amended complaint that properly invokes this Court's jurisdiction.

### B. Initial Complaint

On September 17, 2018, Plaintiff initiated this action individually and on behalf of all others similarly situated against Defendant Nationwide Bank. (Compl.) The Complaint states that "[t]his consumer protection class action seeks equitable, declaratory, and monetary relief to redress Defendant's pattern and practice to fail to provide commercially reasonable post-repossession consumer disclosure notices." (*Id.* ¶ 2.)

According to the Complaint, in 2013, Plaintiff, a Pennsylvania resident, refinanced his 2012 Ford Mustang through Defendant, executing a Promissory Note in favor of Defendant and entering into a Consumer Security Agreement ("CSA") with Defendant, both attached to Plaintiff's Complaint as Exhibits A and B, respectively. (*Id.* ¶¶ 3, 6–10.) On September 17, 2015, Defendant (or agents on its behalf) repossessed Plaintiff's Ford Mustang. (*Id.* ¶ 11.) Defendant sent Plaintiff a Notice of Repossession on the same day as repossession, which Plaintiff alleges failed to comply with the UCC requirements for post-repossession consumer disclosure notices.[2] (*Id.* ¶¶ 12–13.) Plaintiff also alleges that Defendant never sent Plaintiff a "Post-Sale Notice,"[3]

---

[2] Specifically, Plaintiff alleges that the Notice of Repossession violated UCC § 9614(A)(1) in that it: (1) failed to conspicuously state the intended method of disposition of the Ford Mustang (i.e. either public or private sale) and failed to state the time and place of disposition; and (2) failed to conspicuously state that Plaintiff was entitled to an accounting of the unpaid indebtedness and charge for such accounting. (Compl. ¶ 25.)

[3] Plaintiff then pleads, in the alternative, that if Defendant did send a Post-Sale Notice, it did not contain all of the mandatory information required under applicable law. (Compl. ¶ 29.)

which would have provided an explanation of the calculation of surplus or deficiency after Defendant sold the repossessed vehicle, and such failure is also a UCC violation. (*Id.* ¶¶ 14–15.)

Plaintiff's Complaint asserts that his own individual claims fall under the Pennsylvania UCC, but the Complaint's class description, as relevant here, includes individuals who "resided in *a* state that adopted the sections of the UCC which is the same or substantially similar in content to 13 Pa. C.S. §§ 9610, 9611, 9613, 9614, and 9625," in which case the equivalent statute in that state applies to the proposed class member's claims. (*Id.* at n.1 & ¶ 40 (emphasis added).) Therefore, "[t]he UCC of the state each class member resides in at the time of the filing of this Complaint is the governing law." (*Id.* ¶ 19.)

The Complaint pleads a proposed "Main Class" comprised of all persons:

- a) who financed or refinanced a motor vehicle primarily for personal, family or household use through [Defendant]; and,
- b) whom [Defendant], as secured party, repossessed the vehicle or ordered it to be repossessed; and,
- c) who, at the time the [Defendant] or its agent, sent a Notice of Repossession to its borrower(s), who resided in a state that adopted the sections of the UCC which is the same or substantially similar in content to 13 Pa. C.S. §§9610, 9611, 9613, 9614, and 9625; and,
- d) who were not sent a **Notice of Repossession** clearly and conspicuously stated:
    - (i)  the intended method of disposition (whether the vehicle would be sold at a public or private sale) and, in the case of a public sale, the time and place of the location of the disposition; or,
    - (ii)  that the recipient was entitled to an accounting of the unpaid indebtedness and the charge for such accounting;

(*Id.* ¶ 40 (emphasis added).) Claims of the "Main Class," which focus on UCC violations related to Notices of Repossession, are labeled as "Count I." (*Id.* ¶¶ 58–61.) The Complaint then pleads a "Subclass" defined as all persons in the Main Class:

- a) whose vehicle was resold by [Defendant] following repossession; and,
- b) who:
    - (i)  either were not sent a **Post-Sale Notice**; or,
    - (ii)  were sent a **Post-Sale Notice** which failed to contain all of the following information, in the following order:

4

1.     first, the aggregate amount of the obligation secured by the security interest, and, if the amount reflects a rebate of unearned interest or credit service charge, a timely indication of that fact;

2.     second, the amount of proceeds of the disposition;

3.     third, the aggregate amount of the obligations after deducting the amount of proceeds;

4.     fourth, the amount, in aggregate or by type, and types of expenses, including expenses of retaking, holding, preparing for disposition, processing and disposing of the collateral and attorney fees secured by the collateral which are known to the secured party and relate to the current disposition;

5.     fifth, the amount, in the aggregate or by type and types of credits, including rebates of interest or credit service charges, to which the obligor is known to be entitled and which are not reflected in the amount in sub-paragraph 1 above; and,

6.     lastly, the amount of the surplus or deficiency.

(*Id.* ¶ 41 (emphasis added).) Claims of the "SubClass," which relate to UCC violations pertaining to Post-Sale Notices, are labeled as "Count II." (*Id.* ¶¶ 62–64.) In summary, the "Main Class" captures recipients of allegedly deficient Notices of Repossession, and the "Subclass" captures recipients of those Notices of Repossession who also were sent allegedly deficient Post-Sale Notices or were not sent Post-Sale Notices at all.

## C. Procedural History

Defendant answered the Complaint, ECF No. 29, and filed a Motion for Partial Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c)—seeking dismissal of Count II of Plaintiff's Complaint for failure to state a claim and lack of standing—and a Motion to Strike Plaintiff's Class Allegations under Rule 23(d)(1)(D). (Def.'s Mot. for Partial J., ECF No. 30.) Defendant filed a brief in support of that Motion for Partial Judgment. (ECF No. 31.) Instead of filing a response to the Motion for Partial Judgment, Plaintiff filed a Motion to Determine Choice of Law and supporting brief (Mot. to Determine Choice of Law, ECF No. 38; Pl.'s Br. in Supp., ECF No. 39), the pending Motion to Amend, and finally a Motion to Stay (his own)

Motion to Determine Choice of Law (Mot. to Stay, ECF No. 47). The Court denied the Motion to Stay and directed the parties to fully brief Plaintiff's Motion to Amend. (Order, ECF No. 48.)

Plaintiff seeks leave to amend his Complaint: "(1) to add more factual detail in light of the preliminary discovery provided; (2) to make the claims for relief under Ohio law (in the alternative to Pennsylvania); (3) to add additional classes; and (4) to bolster the pending UCC claims, adding an additional subclass." (Mot. to Amend ¶ 2.) Plaintiff attached the PAC to the Motion to Amend. (ECF No. 45-1.)

### D. Plaintiff's Proposed Amended Complaint

The PAC contains substantial changes from the Complaint. Most important to the pending Motion to Amend, the PAC pleads that the CSA (Exhibit 7 to the PAC) and the Promissory Note (Exhibit 6 to the PAC) trigger the application of Ohio substantive law to Plaintiff's individual UCC claims at issue, but should the Court conclude Ohio law is not the applicable law, then Pennsylvania law applies. (PAC ¶¶ 9, 26.) Plaintiff relies on two contractual provisions to support his shift in position from the initial Complaint, which asserted that Pennsylvania law applied to his individual claims. The first provision is located in the attached Promissory Note[4]:

**GOVERNING LAW. This Note will be governed by and interpreted in accordance with federal law and the laws of the State of Ohio. This Notice has been accepted by the Lender in the State of Ohio.**

(Ex. 6-Promissory Note, PAC.) The second provision is in the attached CSA[5]:

**GOVERNING LAW. This Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Ohio, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the**

---

[4] This is the same Promissory Note attached as Exhibit A to the Complaint.

[5] This is the same CSA attached as Exhibit B to the Complaint.

**Property, which will be governed by the laws of the Commonwealth of Pennsylvania. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by the Note and this Agreement has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of Ohio.**

(Ex. 7-CSA, PAC.)

The PAC also re-structures the Complaint's proposed classes and subclasses. The PAC pleads:

- A "proposed Main Class" of individuals who financed/refinanced a motor vehicle through Defendant, were sent a notice of repossession substantially similar to Plaintiff's, and entered into a promissory note and a consumer security agreement containing a "Governing Law" provision stating that Ohio law applies. (PAC ¶ 53.)

- A "proposed Alternative Main Class" that would include individuals whose vehicle was repossessed in Pennsylvania and received a Notice of Repossession (the same or substantially similar to Plaintiff's) but not by certified mail. (*Id.* ¶ 54.)

- A "proposed Post-Sale Notice Subclass," which purports to include persons in the "proposed Main Class" who were not sent a Post-Sale Notice, or were sent one only after being sent a monthly statement stating that a balance existed or payment was owed, or were sent a post-sale notice which stated an incorrect amount in the itemization of the total amount owed at the time of sale as of the fate of the notice. (*Id.* ¶ 55.)

- Two "proposed Alternative Post-Sale Notice Subclasses," in the event the Court concludes Ohio choice of law does not apply. (*Id.* ¶ 56.)

7

o The first would include all persons in the "proposed Main Class"[6] whose vehicles were repossessed in Pennsylvania and, within six months of the filing of this action, were not sent Post-Sale Notices, or were sent Post-Sale Notices only after being sent either a monthly statement stating that a balance existed or any other demand for payment on the account. (*Id.*)

o The second would include all persons in the "proposed Main Class" who were sent a Post-Sale Notice at an address in Pennsylvania on or after December 1, 2014, but not by registered or certified mail. (*Id.* ¶ 57.)

In opposing the Motion to Amend, Defendant argues that Plaintiff is attempting to avoid a ruling on arguments raised in its Motion for Judgment on the Pleadings and is using this pending motion to "test drive various legal positions to avoid adverse rulings." (ECF No. 49, at 2.) Specifically, Defendant argues that the PAC would be futile because the proposed amendments seeking to add claims under Ohio law fail to state a claim upon which relief could be granted. Defendant incorporates its brief in opposition to Plaintiff's Motion to Determine Choice of Law. (ECF No. 44.) Plaintiff replied, incorporating its Motion to Determine Choice of Law and brief in support.[7] (ECF Nos. 38, 39.)

---

[6] The PAC defines the "alternative Subclasses" as subclasses of the "Main Class" not subclasses of the "alternative Main Class." Whether this was Plaintiff's intent is unclear, but this demonstrates one of the pitfalls of pleading complex alternatives.

[7] In Plaintiff's reply to his Motion to Amend, he "incorporates all of his arguments set forth" in his brief in support of his Motion to Determine Choice of Law. (ECF No. 50 at 7 n.2 (referring to ECF No. 39).) That incorporated brief devotes eleven of its fifteen pages to an argument that this Court should enforce the CSA's choice-of-law provision, but Defendant does not object to such enforcement. (ECF No. 39, at 1–11; ECF No. 49, at 6.) The parties are advised that bulk incorporation of prior written submissions is strongly disfavored, as are block quotes consuming four pages. (*See* ECF No. 39, at 7–10.)

8

## II.    APPLICABLE LEGAL STANDARD

Leave to amend shall be "freely given when justice so requires," Fed. R. Civ. P. 15(a)(2), in order to promote the general policy of the Federal Rules of Civil Procedure that cases are better resolved on their merits. *Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017). The standard for granting leave to amend was recently outlined by our Court of Appeals in *Mullin*:

> In determining whether leave to amend might reasonably be denied, courts are guided by the *Foman* factors, named for the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178 (1962). Denial of leave to amend can be based on undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility. The *Foman* factors are not exhaustive, allowing a court to ground its decision, within reason, on consideration of additional equities, such as judicial economy/burden on the court and the prejudice denying leave to amend would cause to the plaintiff. All factors are not created equal, however, as "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006).

*Mullin*, 875 F.3d at 149–50. A court should only deny leave "when these factors suggest that amendment would be 'unjust.'" *Arthur*, 434 F.3d at 203.

Because Defendant has only raised arguments under the futility factor, the Court will only analyze that factor. "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (internal quotations omitted).

## III.    DISCUSSION

Defendant argues that many of the proposed amendments in Plaintiff's PAC are futile, as they erroneously rely on Ohio law. Therefore, Defendant asks this Court to first determine the governing law for Plaintiff's UCC claims. Both parties agree that the CSA and Promissory Note

include valid choice-of-law provisions, and the Court agrees.[8] However, the parties disagree on whether Plaintiff's claims fall under the CSA's general "Governing Law" provision, which dictates that Ohio law governs, or under the "Governing Law" provision's exception (the "Exception Clause"), which dictates that Pennsylvania law governs.

## A. The Governing Law Provision in the CSA is the Controlling Provision for Plaintiff's Claims.

Before the Court may evaluate the CSA's general Governing Law provision and its Exception Clause, it must first address the Promissory Note and that "Governing Law" provision. Although Plaintiff argues that his claims fall under the CSA's Ohio Choice-of-Law provision, Plaintiff also argues that the Promissory Note's Ohio choice-of-law provision supports the conclusion that Ohio law should govern his claims. [9] The Court disagrees.

The Promissory Note unequivocally invokes Ohio law, but only with respect to the governance of the Promissory Note itself. The CSA mandates that *it* is to be governed by the laws of Ohio "except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Property, which will be governed by" Pennsylvania law (the Exception Clause). (CSA ¶ 28.)

---

[8] The choice-of-law provisions in the CSA and Promissory Note, as a whole, are enforceable. "In a diversity action, we must apply the substantive law of the state in which the forum is located, including that state's choice-of-law rules." *PMC Film Can., Inc. v. Shintech, Inc.*, 265 F. App'x 126, 128 (3d Cir. 2008) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). This Court is located in Pennsylvania, and "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994). Under Pennsylvania choice-of-law rules (which it adopted from the Restatement (Second) Conflict of Laws § 187), a choice-of-law provision will be enforced unless (1) the "chosen state has no substantial relationship" to the parties or transaction or otherwise no reasonable basis for such choice, or (2) applying the chosen law "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." Restatement (Second) Conflict of Laws § 187(2)(a)–(b); *see Kruzits*, 40 F.3d at 55. This Court concludes that neither of the exceptions apply. The Court will enforce the choice-of-law provisions at issue here, as they apply to these claims.

[9] Although Plaintiff points out that Defendant could have elected to transfer this case to Franklin County, Ohio (ECF No. 39, at n.1), Plaintiff provides no legal support, and the Court is unaware of any, that Defendant's decision to not so seek to transfer affects this choice-of-law analysis or the contract interpretation that follows.

10

The proposed amended claims allege that Defendant failed to send commercially reasonable post-repossession consumer disclosure notices to its debtors, including Plaintiff. (PAC ¶ 2.) Specifically:

1. Defendant failed to provide a Notice of Repossession that stated the intended method of disposition, the time and place of the disposition, Plaintiff's rights to an accounting, Plaintiff's right to redeem the repossessed vehicle up through the date of sale.

2. Defendant failed to provide a Post-Sale Notice prior to or at the same time that Defendant sent demand for payments of deficiencies.

3. Defendant sent Post-Sale Notices containing incorrect figures or, in the alternative, insufficient explanation of calculations of surpluses or deficiencies.

4. Defendant failed to send Post-Sale Notices by registered or certified mail (or in the case of Pennsylvania class members, in person).

(PAC ¶¶ 39–46.)

These claims plainly relate to matters arising under the CSA and not the Promissory Note. Plaintiff's claims do not address Plaintiff's obligations or rights as they pertain to his loan from Defendant. Rather, these claims go the heart of the repossession process for secured collateral, which is squarely within the purview of the CSA. Furthermore, Plaintiff roots his claims in Article 9 of the UCC, as adopted by various states. The scope of Article 9 applies to "a transaction . . . that creates a security interest in personal property." § 9-109(a)(1). It is the CSA that creates Defendant's security interest in the 2012 Ford Mustang. Because Plaintiff's rights under the UCC spring to life upon the transaction that creates the security interest, Plaintiff's UCC claims arise under the CSA, not the Promissory Note.

11

Even if the Court read both agreements together,[10] the result would be a choice-of-law clause identical to that of the CSA: Ohio law controls "except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Property."[11] The Court concludes that the governing law provision applicable to the claims at issue here is that contained within the CSA.

### B. Plaintiff's Claims Fall within the CSA's Governing Exception Clause.

The next question is, according to the CSA's Governing Law provision, whether Plaintiff's claims fall under the Exception Clause so that Pennsylvania law applies, or whether they do not, so that they are subject to Ohio law. The CSA is a contract, so this is a question of contract interpretation, which is a matter of law. *Enter. Bank v. Frazier Family Ltd. P'ship*, 168 A.3d 262, 265 (Pa. Super. 2017); *Ogan v. Ogan*, 702 N.E.2d 472, 474 (Ohio App. 1997).[12]

---

[10] Under Pennsylvania law, "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." *McCarl's, Inc. v. Beaver Falls Mun. Auth.*, 847 A.2d 180, 184 (Pa. Commw. Ct. 2004) (quoting *Neville v. Scott*, 127 A.2d 755 (Pa. Super. 1957)). Ohio follows the same principle. *See McGovern Builders, Inc. v. Davis*, 468 N.E.2d 90, 92 (2nd Ohio. Ct. App. 1983) ("[B]oth the deed and the contract are parts of one transaction, and the rights of the parties must be determined by the terms of the whole contract.").

[11] In other words, the fact that the Exception Clause does not appear in the Promissory Note does render its existence in the CSA meaningless, as it only applies to claims brought pursuant to the CSA.

[12] Neither party addresses whether the Court should interpret the Exception Clause under Ohio's contract interpretation laws or Pennsylvania's contractual interpretation laws. However, for such purposes, there is no conflict between the two states' laws. The Supreme Court of Ohio explains:

> When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning."

*Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261–62 (Ohio 2003)) (citations omitted).

The Supreme Court of Pennsylvanian explains:

> A contract shall be interpreted in accordance with the parties' intent. When a written contract is clear and unambiguous, the parties' intent is contained in the writing itself. A party will be bound by this writing regardless of whether he or she read and fully understood its terms. A court cannot alter these terms under the guise of construction. Unless otherwise specified, a contract's language shall be given its plain and ordinary meaning.

Again, the relevant portion of that provision directs that:

> This Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Ohio, **except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Property, which will be governed by the laws of the Commonwealth of Pennsylvania.**

(CSA (emphasis added).) Only one other federal court has addressed this contractual language in this context. In *Pint ex rel. Lehigh One, LLC v. Breckner*, the plaintiff sought to invalidate a mortgage, which contained the following choice of law provision: "[m]ortgage shall be governed by . . . the laws of the State of Minnesota, *except and only to the extent of procedural matters related to the perfection and enforcement by Mortgagee of his rights and remedies against the Property*, which matters shall be governed by the laws of the State of Florida." No. 08-CV-5340, 2009 U.S. Dist. LEXIS 107909, at *7 (D. Minn. Nov. 18, 2009) (emphasis added). The Court concluded that Florida law designated in the "exception clause" applied, as the plaintiff was seeking a declaration that the mortgage was void, which went to the heart of the mortgagee's right to "enforcement." *Id.*

Like the analysis in *Breckner*, the Court concludes that the nature of Plaintiff's claims—that Defendant failed to follow the proper procedure while exercising its right to repossess and sell the secured property—fit squarely within the Exception Clause, as they go to the heart of Defendant's right to enforce his remedies against the property (here, the Ford Mustang). This derives from the unambiguous plain meaning of the Exception Clause, and the Court need not dive deeper to reach this commonsense conclusion. *See Auto-Owners Mut. Ins. Co. v. Bruce*, 2006 Ohio App. LEXIS 97, at *6 (Ohio Ct. App. 2006) ("The language voluntarily selected,

---

*Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015) (quotations and citations omitted).

drafted into the policy, and contracted to by the parties must be given its plain meaning."); *see also LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) (same).

Plaintiff's argument for a contrary interpretation is unavailing. Plaintiff argues that his claims cannot fit within the Exception Clause because (1) his claims are not based on "procedural" matters, (2) his claims do not relate to "perfection and enforcement," and (3) his claims do not relate to Defendant's "rights and remedies." Those arguments each fail, and here is why.

### 1. Plaintiff's claims relate to "procedural matters"

Plaintiff argues that his claims cannot fall within the Exception Clause because they are not "procedural matters," as the Exception Clause requires. Plaintiff argues his claims cannot be construed as "procedural" because they are substantive UCC violations, violations rooted in statute. Defendant counters that the word "procedural," as it is used in the Exception Clause, means "procedures under the UCC." (ECF No. 49, at 6.) Defendant also accurately points out that Plaintiff describes his claims in the PAC as "failure[s] to follow the **proper procedures** in connection with the repossession,"[13] and this demonstrates how the claims fit within the Exception Clause's requirement that the claims be "procedural matters" related to perfection and enforcement. (*Id.* at 7 (quoting PAC ¶ 48) (emphasis added).)

The Court does agree with Plaintiff that his claims address violations of substantive rights conferred by the state's adoption of the UCC, but the Court disagrees that the term "procedural" as it is used in Exception Clause should be (or even could be) interpreted in the manner in which Plaintiff advocates. Plaintiff cites to the legal definitions of "procedural law" and "substantive law" in Black's Law Dictionary to support his position, but reliance on the term "procedural law" is misplaced for two reasons. First, the Court simply finds no support for the premise that

---

[13] The Court will take Plaintiff at his word.

14

the parties intended the word "procedural" to be synonymous with the legal term of art, "procedural law."[14] Absent evidence to contrary, none of which exists here, the Court is bound to interpret the words according to their plain meaning. Merriam-Webster defines "procedure"[15] as "a particular way of accomplishing something or of acting." *Procedure*, Merriam-Webster Online Dictionary (2018), https://www.merriam-webster.com/dictionary/procedure (last accessed May 9, 2019); *see Random House Dictionary* 1542 (2d ed. 1987) ("an act or a manner of proceeding in any action or process; conduct"); *American Heritage Dictionary* 1404 (5th ed. 2018) ("a manner of proceeding; a way of performing of affecting something"); *Black's Law Dictionary* 1398 (10th ed. 2014) ("a specific method or course of action"). Second, as used in the CSA, the word "procedural" is an adjective modifying the phrase "matters related to the perfection and enforcement." To hold that "procedural" really means "procedural law" ignores the clear syntax of the CSA's language, and would render the word "matters" following it meaningless.

The Court concludes that the unambiguous interpretation of "procedural" as it is used in the CSA's Exception Clause is that it refers to the method of actions or manner in which to accomplish the perfection and enforcement of Defendant's rights and remedies against Plaintiff's 2012 Ford Mustang. The Court is able to discern this interpretation from the four corners of the CSA, but its unambiguity is demonstrated by Plaintiff's own summary of his claims as

---

[14] Plaintiff cites to *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, in which our Court of Appeals held that "prejudgment interest in contract actions is a substantive rather than a procedural matter." 609 F.3d 143, 171 (3d Cir. 2010). Plaintiff relies on the Court's rational that because prejudgment interest in contract actions is set by statute rather than rule, prejudgment interest is a "substantive matter" that is governed by the contract's choice-of-law provision. *Id.* at 171–73. That case was not about a contract's use of the word "procedural matters" within a choice-of-law provision.

[15] The definition of "procedural" is not particularly helpful as it is often defined as "pertaining to a procedure." *See, e.g.*, *Random House Dictionary* 1542 (2d ed. 1987).

"failure[s] to follow the proper **procedures** in connection with the repossession." (PAC ¶ 48 (emphasis added).)

Furthermore, if any substantive violation of either the UCC or any other commercial statute or code fell outside the Exception Clause because it is not "procedural," the only remaining claims that would be governed by the Exception Clause would be bare procedural violations. The United States Constitution bars plaintiffs from bringing claims before Article III courts on bare procedural violations. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Adopting Plaintiff's interpretation of "procedural" would both render the Exception Clause meaningless and would self-plead him out of this Court. The Exception Clause's term "procedural matters" does not knock Plaintiff's claims out of the Exception Clause.

### 2. *Plaintiff's claims relate to "perfection and enforcement"*

Plaintiff next argues that the Exception Clause only includes claims that relate to both "perfection *and* enforcement," as in the use of *and* should be read in the conjunctive. Plaintiff's proposed interpretation is that the claims must be both a matter of perfection and a matter of enforcement to fall within the Exception Clause. Any other interpretation, Plaintiff argues, would be an impermissible substitution from *and* to *or* of the parties' chosen language.[16]

---

[16] In his reply brief, Plaintiff drops a footnote that includes the following hyperlink to an article about the "Oxford comma," https://thewritelife.com/is-the-oxford-comma-necessary. Whatever point Plaintiff is trying to make (as the pitfalls of the Oxford comma are not at issue in this case) is lost due to his deviation from the proper form of legal citations, i.e. Bluebook. Here, the lack of citation information (and incorrect introductory signal) makes it difficult for the reader to ensure that Plaintiff intended to cite this specific article—which begins: "Who gives a $#%&& about an Oxford comma?"—to a federal court. The Court instructs Plaintiff that he shall adhere to this Court's Local Rules, which specifically state that "hyperlinks to a cited authority may not replace standard citation format." LCvR 5.1.L.1(a). The Court also notes that Plaintiff has thus far taken an incredibly freewheeling approach to this litigation. Some examples include responding to motions with motions (e.g., responding to ECF No. 30 with ECF No. 38), seeking a plethora of discovery before his own pleadings are even fixed (ECF Nos. 12, 47), filing notices of mediation out of compliance with the Local Rules (ECF Nos. 52, 53), and even filing a letter with the Court requesting amendments to the Court's Order granting Plaintiff the relief he himself sought (ECF No. 28). Whether these actions are tactics aimed at antagonizing the opposition or a product of simple yet brazen disregard for established procedures is unclear, but this Court has had enough of it and will continue to expect that the lawyers in this case will conduct themselves in accordance with applicable rules and standards.

"The problem with *and* is that 'chameleonlike, it takes its color from its surroundings.'" *Shaw v. Nat'l Union Fire Ins. Co.*, 605 F.3d 1250, 1253 (11th Cir. 2010) (quoting *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958)); *see Reese Bros., Inc. v. United States*, 447 F.3d 229, 235 (3d Cir. 2006) (recognizing that "and" can be either conjunctive or disjunctive).

"*And* can convey that the members of a group are to be considered together, but it can also convey that they are to be considered together and separately." Kenneth A. Adams & Alan S. Kaye, *Revisiting the Ambiguity of "And" and "Or" in Legal Drafting*, 80 St. John's L. Rev. 1167, 1172 (2006). "[W]hether *and* is ambiguous, and in what way, depends entirely on the grammatical context." *Id.*

In the Exception Clause, "related to the perfection and enforcement" functions as a clause modifying "matters," with "perfection and enforcement" functioning as the object predicate of that clause. In Adams and Kaye's article, they discuss object-predicative ambiguity with the following example: "Delta may issue a promissory note to Echo and Foxtrot." *Id.* at 1176. The meaning is ambiguous because it could mean that "Delta may issue a promissory note to both Echo and Foxtrot, as opposed to one or the other," "to Echo, to Foxtrot, or to each of them," or "to Echo and Foxtrot jointly." *Id.*[17] Applied to the language here, the Exception Clause could apply to procedural matters related to *both* perfection and enforcement, *as opposed to one or the other,* as Plaintiff advocates. Or, the Exception Clause could apply to procedural matters related to perfection, related to enforcement, *or related to each*—the "together and separately" conveyance—as Defendant advocates.

---

[17] Conversely, similar issues of ambiguity arise with the conjunctive or disjunctive use of the word "or." "The phrase, 'if you are a husband or a father, you'll understand,' demonstrates the use of 'or' in the conjunctive sense because it intends to include persons who are both husbands and fathers. *Stanley v. Cottrell, Inc.*, 784 F.3d 454, 466 (8th Cir. 2015) (quoting *Shaw v. Nat'l Union Fire Ins. Co.*, 605 F.3d 1250, 1254 n.8 (11th Cir. 2010)).

Several canons of interpretations guide the Court's analysis. First, "[t]he usual meaning of the word 'and,' however, is conjunctive, and 'unless the context dictates otherwise, the 'and' is presumed to be used in its ordinary sense. . . .'" *Reese Bros.*, 447 F.3d at 235–36 (quoting *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1332 (11th Cir. 2005)). Second, ambiguities are construed in favor of the non-drafting party. *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 62–63 (1995). Third, if the two objects predicate cannot be considered collectively, "there is reduced scope for ambiguity." Adams & Kaye, *Revisiting the Ambiguity*, *supra*, at 1176–77.

With respect to this third canon, consider, for example, a municipal code that imposed a tax "on the business of the collection of garbage, rubbish, trash, CDL Waste, and other solid waste." *Philip Servs. Corp. v. City of Seattle*, 2007 U.S. Dist. LEXIS 14906, at *19 (S.D. Texas 2007). In arguing that the tax did not apply to him, the plaintiff argued that the word "and" in the code is conjunctive and required the taxpayer to collect all five enumerated forms of waste. *Id.* The district court rejected this argument, concluding it would result in absurdity as only businesses that collected every possible type of solid waste would be captured by the code provision. *Id.* at *22. The district court concluded that the only reasonable interpretation is that "the enumerated categories of waste are a group that is to be considered separately and individually, not together or collectively." *Id.* at *21.[18] This holding conforms with the rule of law under both Pennsylvania and Ohio law that a court will not adopt a party's unreasonable construction of an otherwise ambiguous provision, even is that party was not the drafter of the contract.[19]

---

[18] For a simpler example of *and* being used to connect "mutually exclusive concepts," the Eleventh Circuit offers the phrase "medical and burial expenses." *Shaw*, 605 F.3d at 1254.

[19] The Ohio Supreme Court stated that:

18

In light of the fact that Plaintiff is the non-drafter and advocating for the ordinary conjunctive form of *and*, his interpretation will prevail so long as it is not an unreasonable interpretation. But such an interpretation is, in fact, unreasonable. Plaintiff himself acknowledges that it is "quite unclear" what the phrase "perfection and enforcement," would mean if read in the conjunctive. (ECF No. 50, at 5.) Plaintiff then surmises that the phrase is meant to capture Nationwide's "inherent enforcement effect against other lien holders and procedural issues relating to the filing of the financial statement/certificate of title to the motor vehicle." (*Id.* at 5– 6.) This cannot be a reasonable interpretation, as the Governing Law clause only applies to those who are bound by the CSA itself. It certainly does not govern disputes between competing lien holders. Even the second component of Plaintiff's hypothesized meaning—procedural issues related to the filing of financial statement/certificate of title—embraces a disjunctive approach as it only addresses *perfection* but not *enforcement*. The reality is that perfection is a process all onto itself, warranting an entire subsection of Article 9 of the UCC. *See* § 9-301 to -342. The Court agrees with Plaintiff that construing the Exception Clause's phrase "perfection and enforcement" in the conjunctive renders the meaning "quite unclear." The Court's interpretation, on the other hand, removes the ambiguity of the phrase, and it is interpreted as procedural matters related to perfection, related to enforcement, or related to each. Plaintiff's claims, all related to the process following the creditor's sale of the secured property (i.e. enforcement),

[W]here the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party. . . . [but] that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy.

*Westfield Ins. Co.*, 797 N.E.2d at 1262 (internal quotations and citations omitted). Although *Westfield* addressed the interpretation of an insurance contract, this Court finds no authority that the rule would vary when applied to a consumer security agreement, in which the bargaining positions between a creditor and a debtor mirror those of an insurer and an insured.

Reaching the same conclusion, the Pennsylvania Supreme Court stated that "'[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' The 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." *Trizechahn Gateway Ltd. Liab. Co. v. Titus*, 976 A.2d 474, 483 (Pa. 2009) (quoting *Ins. Adjustment Bureau v. Allstate*, 905 A.2d 462, 468–69 (Pa. 2006)).

19

satisfy the Exception Clause's requirement that the matters relate to "perfection and enforcement."

### 3. Plaintiff's claims relate to Defendant's rights and remedies

Plaintiff argues that his claims are brought pursuant to "a debtor's right to a statutory disclosure notice" which is not "akin to a Lender's rights," taking his claims out of the Exception Clause.[20] Plaintiff, again, fails to read the phrase in the context of the Exception Clause, which applies to "procedural matters *related to* the perfection and enforcement of Lender's rights and remedies against the Property." (CSA (emphasis added).) Plaintiff's claims sufficiently *relate* to the process by which the Defendant (as the lender) enforced its security interest against the property. The UCC's requirements for notification and accounting before and after the disposition of collateral are plainly procedural matters related to Defendant's rights and remedies as the lender.

### 4. Conclusion

Plaintiff's claims fall within the Exception Clause, and Pennsylvania law will apply to Plaintiff's claims. Each of Plaintiff's suggested interpretation arguments independently fails for the same reason: the proposed interpretation of a word or a phrase is unreasonable when viewed in context of the Exception Clause as a whole. Those results become clearer when Plaintiff's three arguments are viewed together. Under Plaintiff's reading of the Exception Clause, only

---

[20] Defendant argues that the phrase "Lender's rights and remedies" within the Exception Clause is a defined term under the CSA that incorporates the repossession of a security interest; therefore, Defendant argues, any claims against it arising out of the repossession of its security interest (the Ford Mustang) fall squarely within the enforcement of its rights and remedies, triggering the governing law directed in the Exception Clause. (ECF No. 49, at 6.) Plaintiff counters that "Lender's rights and remedies" is not a defined term but merely a heading, which the CSA specifically states cannot be invoked to interpret the contract in any way. (ECF No. 50, at 3.) Plaintiff is correct that the CSA does not provide a definition of "Lender's rights" or "Lender's rights and remedies." Rather, the phrase "Lender's Rights" and "Other Rights and Remedies" are paragraph headings, and the names given to paragraphs or sections or caption hearings "are not to be used to interpret or define the provisions" of the CSA. (CSA, at 2.) Therefore, the plain meaning of "Lender's rights and remedies" will guide this Court's interpretation.

claims related to Procedural Law, as that term is used in the legal context, but simultaneously related to *both* perfection *and* enforcement, and that directly enforce Defendant's rights and remedies against the property would fall within the Exception Clause. This is an internally conflicting statement, and its application would render an absurd result.

### C. The Core of Plaintiff's Proposed Amendments are Futile.

Now that the Court has concluded that Pennsylvania law applies to Plaintiff's individual claims, the Court may evaluate the PAC for futility. The PAC proposes alternative class descriptions based on either Ohio law or another state's law expressly contingent on the Court's finding and conclusion regarding which state law applies to Plaintiff's individual claims. Therefore, Plaintiff will not be given leave to amend to include proposed claims that fail to conform with this Opinion (i.e. the claims predicated on the Court concluding that Plaintiff's claims are governed by Ohio law).

The PAC also proposes other class allegations "if it is adjudicated that Plaintiffs' [sic] desired choice of law (Ohio) is not deemed to control these proceedings." (PAC ¶ 54.) The proposed Alternative Main Class is defined, in part, as all persons "whose vehicle was repossessed in Pennsylvania." However, it is unclear what impact the Court's ruling about the applicable law has on this proposed alternative class and its subclasses. The Court's conclusion that Pennsylvania law applied was based on the governing law provision between Plaintiff and Defendant, with Plaintiff's residency or the location of the repossession of no significance. Similarly, the CSA's contractual provisions do not extend to any other individuals. The governing law over other purported class members will in all likelihood hinge on that specific purported class member's governing law provision within his or her own consumer security

agreement with Defendant.[21] But Defendant does not argue in its response to the pending Motion to Amend that those claims also fail as a matter of law. Given that the PAC, as filed, cannot survive in its entirety, Plaintiff will not be granted leave to amend with that particular pleading, but he will be given another, final, opportunity to move anew for amendment.

## IV.    CONCLUSION

Plaintiff's Motion to Amend is denied. Because the Initial Complaint fails to adequately plead subject-matter jurisdiction, this case is dismissed without prejudice to Plaintiff filing a Second Motion to Amend the Complaint conforming with this Opinion and Accompanying Order and without prejudice to Defendant asserting any new argument or re-asserting previous arguments should it decide to oppose the Second Motion to Amend the Complaint.

Mark R. Hornak
Chief United States District Judge

cc:    All counsel of record
Date:  May 17, 2019

---

[21] Plaintiff's proposed Main Class, which depended on the application of Ohio law, required Main Class members to have entered into a consumer security agreement with substantively the same "Governing Law" provision as Plaintiff's CSA but provided no requirements that the situs of the repossession be in the same state. The proposed alternative Main Class had no requirement that proposed members share similar choice-of-law language in consumer security agreements but required that all proposed members had their vehicle repossessed in Pennsylvania. These pleading "alternatives" are not alternatives so much as completely different theories of class membership and UCC application, bordering on the "test-driving" that the Court warned against in *Trunzo. See Trunzo v. Citi Mortg.*, 43 F. Supp. 3d 517, 522 n.4 (W.D. Pa. 2014). While Plaintiff is correct that the procedural history of this case differs substantially from the complicated histories of *Trunzo* and *EEOC v. FedEx Ground Package Sys.*, 15-cv-256, 2018 U.S. Dist. LEXIS 155253 (W.D. Pa. Sep. 12, 2018), it does strike the Court that Plaintiff does not yet have a full grasp on the scope and nature of his own proposed class action, which, in turn, makes it extremely difficult for Defendant to respond to such a pleading and, as already evident on this docket, drums up extensive motion practice on the pleadings. The Court granted Plaintiff some preliminary discovery to help Plaintiff shape his case, but this Court will not further indulge Plaintiff's wash-rinse-repeat style of faulty pleadings. Plaintiff will be given the one final opportunity to amend provided by this Opinion.

22